UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
KENNETH PAGE,                                    :

                   Petitioner,          :

         -against-                        :          **REPORT AND RECOMMENDATION**

JAMES CONWAY,                                   :          10 Civ. 5264 (DAB)(KNF)

              Respondent.    :
------------------------------------------------------X
KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

TO THE HONORABLE DEBORAH A. BATTS, UNITED STATES DISTRICT JUDGE

## INTRODUCTION

On June 14, 2010, Kenneth Page ("Page"), acting pro se, filed a petition for a writ of

habeas corpus, pursuant to 28 U.S.C. § 2254, challenging his conviction for second-degree

murder and first-degree robbery.  On January 7, 2011, the Court granted Page's motion to: (a)

amend the petition, to add the claims that his trial and appellate counsel rendered ineffective

assistance to him in connection with his insufficient evidence claim; and (b) stay and hold in

abeyance the amended petition, until Page exhausts his state-court remedies.  Page exhausted his

state-court remedies.  He asserts the following claims: (1) a "failure [of the prosecution] to prove

guilt beyond a reasonable doubt;" (2) a failure of the trial court to provide a "missing witness

[jury] instruction;" (3) the jury verdict was against the "weight of the evidence;" (4) his

"aggregate prison sentence" is excessive; (5) a failure by trial counsel to render effective

assistance, in connection with his insufficient evidence claim; and (6) a failure by appellate

counsel to render effective assistance, by failing to raise, on appeal, the claim of ineffective

assistance of trial counsel, in connection with his insufficient evidence claim.  The respondent

opposes the amended petition.

## BACKGROUND

Ramon Ayuso ("Ayuso") lived alone in apartment 6E, at 106 East 117th Street, in

Manhattan.  Andres Medina ("Medina"), a friend of Ayuso's, had a mechanic shop, at 117th

Street and Park Avenue, in Manhattan.  On June 13, 2002, at approximately 1:30 p.m., Medina

was working in his shop, when he received a telephone call from William Jacobs informing him

that Ayuso had been shot in the stomach.  Medina called 911, then ran out to the street, where he

saw Ayuso emerge from his apartment building, calling for help.  Medina took Ayuso in his

arms and lowered him to the sidewalk in front of the building.  When Medina asked what

happened, Ayuso said two men had robbed him, taking a chain from his neck; the one who shot

him was a "moreno," whom he did not know.  Medina lifted Ayuso's shirt and saw that he had

been shot in the stomach.

Emergency Medical Services ("EMS") technician John Vinciguerra ("Vinciguerra")

arrived at 106 East 117th Street and found Ayuso lying on the sidewalk in front of the building,

moaning in Spanish.  Vinciguerra located a gunshot wound in Ayuso's abdomen.  He noted that

there was "not a lot of blood" and removed Ayuso's shirt to look for other injuries.  Ayuso was

still conscious and gave Medina his keys and wallet.

Police Officer Antonio Exposito ("Exposito") arrived at the 106 East 117th Street

building, while Vincinguerra was attending to Ayuso.  Exposito spoke to Medina, who

surrendered Ayuso's keys, wallet and beeper.  Exposito set up crime scene tape around the

entrance to 106 East 117th Street.  He walked through the building to a rear courtyard enclosed

by a six-foot fence, which was broken in areas.  Exposito did not see blood at the building

entrance, in the hallway or in the rear yard.

2

Detective Steven Flores ("Flores") arrived at the front of the building as EMS workers lifted Ayuso into the ambulance.  Ayuso appeared to be in considerable distress.  He was "very pale," "turning blue," and struggling to breathe.  Flores spoke to Ayuso, who said he had been shot by a "skinny," dark-skinned man, wearing a blue jacket and blue pants.  Flores accompanied Ayuso to Harlem Hospital's Trauma Room.  Ayuso died later that afternoon.

At approximately 2:30 p.m., Detective George Boston ("Boston") arrived at 106 East 117th Street.  After sketching the building's exterior and scanning the outside area for evidence, Boston learned, from members of the detective squad, that "possibly something happened" inside apartment 6E, on the third floor, where Ayuso lived.  Boston walked upstairs, finding no blood or ballistic evidence on the stairs or in the hallways.  On the third floor, apartment 6E's door was open.  Two gold neck chains lay just inside the entryway.  After photographing the chains, Boston gave them to Officer Marlene Quinones ("Quinones"), who was waiting at the apartment's entrance with Detectives Jeffrey Jamal ("Jamal") and Anthony Norcia ("Norcia").  Boston entered the apartment, which was small and "cluttered"; clothing, electronic equipment and tools were "spewed around the whole location."  The bathroom was situated to the left of the entryway and was also littered with clothing and "other stuff."  As Boston proceeded into the apartment it was difficult to move and officers were unable to reach the far corners of the main room due to the mess.  Boston's search of the apartment focused primarily on the entryway and bathroom, the only areas that appeared to have been recently disturbed.  He dusted several areas for fingerprints, including the door and entryway.  Boston did not notice anything "obvious" in the cluttered bathroom, and did not recall seeing a hat, glasses, or any bullets or shell casings.

Once the crime scene officers left, Quinones and Jamal locked the apartment door and sealed it with tape.  Jamal kept the only set of keys in his locker at the 25th Precinct.  A few days

later, Jamal escorted members of Ayuso's family to the apartment to retrieve clothing for Ayuso's burial.

Kim Parsons ("Parsons"), who sold and smoked crack, had met Page in the neighborhood several months earlier.  Not long after their initial meeting, Page began spending time at 1990 Lexington Avenue,  apartment 9G, smoking crack with Parsons, her friend Gigi Semidey ("Semidey") and the apartment's tenant who was known by the nickname "Grandma." One day, in June 2002, Parsons was at apartment 9G with Semidey, when someone knocked at the door. When Semidey opened the door, Page was standing in the hallway with Jonathan "Sheisty" Torres ("Torres").  Page was wearing blue pants, a blue shirt and a blue jacket and was sweating. Torres was carrying a bag.  Page told Torres to hand him the bag.  Page then gave the bag to Parsons and directed her to take it inside.  While Page and Torres waited in the stairwell, Parsons took the bag into the apartment.  There, she and Semidey examined its content; it contained a gun, two ski masks, two pairs of gloves and a roll of duct tape.

Page started banging on the apartment's outside wall.  In response, Parsons placed the bag in a closet and went back to the hallway.  At Page's direction, Torres gave him two gold chains.  Torres was wearing another thick gold chain around his neck, and Page estimated Torres could "get four" for that chain.  Both men had a lot of money in fifty and twenty-dollar bills.  As Torres turned to leave, Page told him to bring back a change of clothes, but Torres did not return.

Once Torres left, Page told Parsons he had something to tell her in confidence.  Parsons led Page to the back room, where Page told her he "shot somebody and robbed him" of money and jewelry.  Although Page did not tell Parsons where the shooting occurred, he mentioned that he left his hat and glasses "at the apartment," and thought he should go back to retrieve them. Page, Semidey and Grandma spent the rest of the afternoon smoking crack.

4

Later that afternoon or evening, after all their crack had been consumed, Parsons, Page and another man named "Ted" took Page's gun to apartment 11B, where Parsons' s sister lived with her boyfriend William Neely ("Neely").   Page waited in the hallway while Parsons and Ted went inside with a black .380 caliber gun with a ridged handle.   Parsons and Ted showed Neely the gun and explained that someone wanted to sell it.   Ted gave the gun to Neely, who, after examining it, agreed to buy it for $150.   Neely disassembled the gun and stored it in a shoebox. He then went to the hall, where he gave Parsons a partial payment of thirteen $10 bags of crack. Parsons gave the crack to Page.   Later that night, Page threw the gloves, masks and duct tape from the stashed bag into the building's incinerator.   By the time Page left, he had changed his clothes.

After Page's departure, Parsons went downstairs to talk to her seventeen-year old son, Joseph.   She noticed that Joseph was wearing a chain similar to the one she had seen Page handling earlier that day.   She took the chain form her son and gave it to her daughter, instructing her to return it to Page the next time she saw him.

Page returned to Neely's apartment two days later to collect two bags of crack to make an even one hundred-fifty dollars payment for the gun.   He also asked for two additional bags of crack and paid with a bloodied twenty-dollar bill.   Page, who appeared dirty, told Neely that he had been "hiding" in a dumpster.   Around the same time, Page visited Grandma's apartment. There, he asked Parsons if the police were looking for him.   He said if he "went down" for the crime, "everyone else [was] going down."

On June 14, 2002, Dr. Carolyn Kappen ("Dr. Kappen") of the Medical Examiner's Office, performed an autopsy on Ayuso's body.   According to Dr. Kappen, Ayuso's death was

caused by a gunshot would to his abdomen.  The bullet entered Ayuso's body just below his left

ribs and traveled through his body, lodging internally on the right side of his back, from where it

was recovered.  Dr. Kappen detected gunpowder residue around the entrance wound, an

indication that the shot was fired from no more than twelve to eighteen inches away.  The

entrance wound position and the residue around it were consistent with the bullet hole in the

victim's t-shirt.  In Dr. Kappen's experience, it was not uncommon for a single gunshot wound

to produce minimal bleeding, particularly when the bullet failed to exit the victim's body.

Ayuso also sustained multiple scrapes and bruises to his head, hands, arms and knees, including

a half-inch abrasion on his forehead and several faint scrapes on his eyelids, cheek and neck.

The abrasions were recent.  Ayuso's neck showed a "patterned" abrasion consistent with a chain

being torn from his neck by force.  His minor injuries, taken together, were consistent with a

physical struggle and possibly a fall to the ground.

On July 30, 2002, Jose Martinez ("Martinez"), who lived in apartment 6D, at 106 East

117th Street, called his landlord to report that the door to Ayuso's apartment looked "a little

bent."  The door was not otherwise damaged or open and Martinez did not hear any sounds of a

disturbance.  Police Officer Eric Berrios ("Berrios") responded after receiving a radio call

reporting suspected trespass of Ayuso's apartment.  He did not notice anything suspicious about

the door, and when he tried the knob, he found the apartment was locked.  Berrios saw no one

outside the door, heard no noises inside and no one responded when he knocked.  Berrios

radioed dispatch to inform them that the call was "unnecessary."

Based on the information obtained during the investigation of Ayuso's murder, Detective

Michael Callan ("Callan") went to 1990 Lexington Avenue, apartment 9G, early on the morning

of July 31, 2002.  Callan met Parsons in the apartment and asked her to accompany him to the

precinct.  Parsons agreed, reluctantly.  Although Parsons was anxious and high, she spoke with

Callan at the precinct for several hours and signed a written statement summarizing their

conversation.  That statement mentioned the hat and glasses Page admitted having left in the

victim's apartment.

      Later that morning, Jamal and Detective Brian Long ("Long") returned to Ayuso's

apartment to look for the hat and glasses.  While Long proceeded into the apartment's main

room, Jamal searched the bathroom.  Several cardboard boxes were piled on the floor in front of

the toilet with a bucket and a folding grocery cart.  The hat and glasses were on the floor

immediately in front of the toilet.  Jamal notified the Crime Scene Unit to collect the evidence.

Detective Christopher Florio ("Florio") arrived and photographed the hat and glasses.  He

packaged the evidence and gave it to the detectives for vouchering.

      On August 9, 2002, Callan took Parsons and her daughter to the Manhattan District

Attorney's Office.  During that visit, Parsons' daughter gave Callan the chain that her mother

took from Joseph in June.  Following that meeting, Parsons returned to the precinct to make

another written statement.  Later that evening, Parsons gave Callan several articles of clothing

that Page left at Grandma's–a black shirt, blue pants and one black boot.

      On October 24, 2002, Callan met with Neely, his attorney and a prosecutor at the District

Attorney's Office.  During that interview, Neely provided information pursuant to a debriefing

agreement.  Based on the information obtained during that meeting, Detective Richard

Koprowski ("Koprowski") went to 1990 Lexington Avenue, apartment 11B.  There, Parsons's

sister directed him to a shoebox that contained a black .380 caliber handgun.  Callan sent the gun

to the police laboratory for testing.  On October 30, 2002, Edwardo Marcano, a video technician employed by the District Attorney's Office, went to 106 East 117th Street with an assistant district attorney and a detective to videotape Ayuso's apartment.

Around November 13, 2002, Carmen Rivas ("Rivas") and her daughter received permission from detectives to return to Ayuso's apartment to remove his belongings.  While cleaning the bathroom, Rivas discovered a bullet casing on the floor near the tub, partially obscured from view.  After photographing the casing, Rivas placed it in a plastic bag and notified a detective from the 25th Precinct.

On August 23, 2002, Criminalist Lydia DeCastro ("DeCastro") received a pair of glasses and a baseball hat to analyze.  She isolated DNA from the perspiration left around the hat's inner rim, but found no DNA on the glasses.  In the meantime, the police investigation focused on Page.  On September 26, 2002, Callan took swabs of Page's saliva, pursuant to a search warrant. DeCastro compared DNA from Page's saliva swab with DNA from the hat and determined that they matched.  The DNA tests excluded Torres and Ayuso as sources.

In October 2002, Criminalists Michelle Miranda ("Miranda") and John Kraljic ("Kraljic") performed operability and gunshot-residue-pattern testing on the gun that Neely purchased from Page.  Preliminary testing indicated that the gun was an operable Lorcin .380 caliber semi-automatic pistol.  Miranda and Kraljic fired the gun at test targets from various distances and compared the resulting residue patterns to the residue pattern on Ayuso's t-shirt. Miranda concluded that the shot that killed Ayuso was fired from a muzzle-to-target distance of no more than one to nine inches.

On November 1, 2002, Page was charged by a grand jury with second-degree murder,

8

first-degree robbery and second-degree robbery.  On November 22, 2002, Detective Mark Basoa ("Basoa") performed a microscopic comparison of the bullet recovered from Ayuso's body, at autopsy, and the gun Page had sold to Neely.  By comparing the tooling inside the gun's barrel to the markings on the spent bullet, Basoa concluded that the bullet that killed Ayuso was fired from Page's gun.  Basoa also compared the gun's barrel markings to the shell casing recovered from the bathroom of Ayuso's apartment.  While not a conclusive match, the markings on the shell casing were consistent with having been fired from Page's gun.

On May 25, 2005, ophthalmologist Jeffrey Spitzer ("Spitzer") examined the glasses recovered from the bathroom in Ayuso's apartment.  Using an automated lens meter, Spitzer determined that the glasses had an "incredibly unusual" prescription and they matched "almost exactly" a prescription written for Page on April 19, 1997.  Spitzer noted that although updated prescriptions had been issued for Page on subsequent dates, a notation on a prescription from March 9, 2000, indicated that Page reported "better vision with [his] old glasses."

Page proceeded to trial, where he was identified by Parsons, Jamal, Callan and Norcia. Neely identified Page as the man who sold him a gun in mid-June 2002.  Page presented no evidence at trial.  He was found guilty for second-degree murder and first-degree robbery, but acquitted of second-degree robbery.  Page was sentenced, as a second-felony offender, to 25 years imprisonment for the first-degree robbery and an indeterminate term of 25 years to life for the second-degree murder, to run concurrently.

Page appealed from the judgment of conviction, raising three issues: (1) the evidence was insufficient to support the jury verdict and the verdict was against the weight of the evidence; (2) he was entitled to a missing witness jury instruction; and (3) his sentence was excessive.  The

New York Supreme Court, Appellate Division, First Department: (a) rejected Page's insufficiency of the evidence claim as unpreserved and, in the alternative, on the merits, and found that the verdict was not against the weight of the evidence; (b) found that the trial court denied properly Page's "request for a missing witness charge regarding the son of the main prosecution witness, on the ground that the uncalled witness was not under the People's control," and "[t]he uncalled witness's mother was not a victim of the crime, and there were no circumstances warranting an expectation that the uncalled witness would testify favorably to the People"; and (c) perceived no basis for reducing the sentence. People v. Page, 57 A.D.3d 291, 868 N.Y.S.2d 526, 526-27 (App. Div. 1st Dep't 2008). The New York Court of Appeals denied Page's application for leave to appeal. See People v. Page, 12 N.Y.3d 819, 881 N.Y.S.2d 27 (2009).

Thereafter, Page made a motion to vacate the judgment, pursuant to New York Criminal Procedure Law ("CPL") § 440.10, claiming his trial counsel provided ineffective assistance to him because she failed to: (1) prepare and investigate the case; (2) develop the record; (3) correct his "probation interview"; (4) seek sanctions for "the loss [of] memo pad of Det. Jamal"; (5) "challenge the legal sufficiency of the evidence"; (6) "call the expert witness"; and (7) "make an adequate motion for trial order of dismissal to preserve the legal sufficiency of the evidence" challenge. On April 7, 2011, the state trial court denied Page's § 440.10 motion. It rejected Page's argument that counsel failed to challenge the sufficiency of the evidence because it "was raised and rejected, on the merits, on his direct appeal." The state trial court rejected all other grounds of Page's ineffective assistance of counsel claim, as procedurally barred and, alternatively, on the merits. The court found that counsel: (a) "was thoroughly prepared and she

vigorously cross examined all witnesses against [Page]"; (b) "was able to secure a 'sanction' against the People for the loss of the detective's steno pad in that she convinced the court to charge the jury that they could infer that defense counsel's cross examination of the detective was adversely affected by his inability to locate and produce his notes regarding defendant's case"; and (c) "was vigilant in protecting the record and her motion for a trial order of dismissal, while somewhat late, was nonetheless adequate and on point."   The court found that Page's argument "that counsel failed to investigate apparent discrepancies in the witnesses' stories, failed to call an expert witness to challenge the findings of the People's expert and failed to call the alibi witnesses all implicate counsel's strategy," and his motion "is supported by only his self-serving, after-the-fact affidavit," rather than his attorney's affidavit explaining her reasoning in connection with these issues.   The court concluded that "counsel demonstrated skill and competence, mounting a strong defense in the face of extremely powerful evidence that included the defendant's DNA on a hat that he left at the crime scene, along with eyeglasses that the police were able to connect to him because of their unusual lense prescription."   The court determined that Page "failed to demonstrate that his attorney's performance was deficient, that he was in any way prejudiced by counsel's actions or that under the totality of the circumstances he did not receive meaningful representation."

***Petitioner's Contentions***

In his petition, Page incorporates the arguments he made on direct appeal, where he contended that "there is no compelling evidence that Ayuso was shot and robbed in his apartment," and the neighbor, who lived across a 5-foot hall from Ayuso and was home on the afternoon of June 13, 2002, testified he did not hear gunshots, yelling or a disturbance.

11

Moreover, no one who responded to the crime scene immediately saw Ayuso walking down the stairs of the building or exiting the front door of the building.  Page contended that the lack of any blood evidence in Ayuso's apartment, the stairwell or in the front hallway of the building, indicates that he must have been robbed and shot outside his apartment and probably outside his building.  According to Page, "[v]iewed in this light, the evidence of [his] hat and glasses, which were found in Ayuso's bathroom, is less critical tha[n] it should have appeared to the jury." Page contended that the discovery of his hat and glasses was of grave concern because they were found on July 31, 2002, and were "clearly visible"; but six weeks earlier, Boston did not see any hat or glasses in the bathroom and no evidence that the hat and glasses were there was provided by any other officer.  Page contended it is incredible that Boston missed seeing the hat and glasses, which suggests that the crime scene was tainted.

According to Page, the evidence showed that the seal Quinones placed on the door of Ayuso's apartment, on June 13, 2002, was violated on several occasions when: (1) Jamal opened the door for Ayuso's relatives to collect some of his property; (2) Norcia searched Ayuso's apartment on a couple of occasions, after the date of the crime; and (3) on July 30, 2002, the day before the hat and glasses were discovered, a neighbor reported that he thought someone was attempting to break into Ayuso's apartment because the door appeared bent to him. Furthermore, Page maintained, the disturbance of the crime scene continued for months including when, about five months after Ayuso's death, his family members were allowed to clean the apartment and discovered a .380 spent cartridge on the bathroom floor.

Page also contended that Parsons's and Neely's credibility was compromised, as no evidence corroborated Parsons's testimony, and Neely had a criminal record.  Furthermore, some

scientific and physical evidence supported Page's lack of involvement in the crime, and Ayuso stated, before he died, that a "skinny" black male was the shooter. Page was not skinny on the date of the crime, since he was wearing slacks with a 38-inch waist.

Page contended he was entitled to a missing witness jury instruction because Parsons, the prosecution's chief witness, testified that, on the day of the crime, Page visited her apartment carrying money, jewelry and a gun, and admitted that he shot someone. She testified further that, after Page left her apartment, she went outside and encountered her son Joseph, who was wearing one of the gold chains that Page had displayed to her. Joseph told her that he just met Page, who was leaving Parsons's apartment, and that Page had given him the chain. Joseph did not testify for the prosecution. Page contended that he established that Joseph had knowledge of material issues in the case and was under the prosecution's control. Since Parsons' credibility was impeached, Joseph's testimony was material and it was not shown that Joseph was unavailable to testify at the trial.

Page asserted that his sentence was excessive, in light of the mitigating factors. According to Page, "Dr. Drob" reported that Page had a terrible, life-altering experience as a child because he was abandoned by his father and traumatized by witnessing the death of his younger brother. Moreover, Page was exposed to alcohol, drugs and crime at a young age, which played a role in making him angry, disappointed and a chronic substance abuser. Dr. Drob's report also suggested that Page was possibly suffering from an untreated mental disorder in the schizophrenic spectrum.

With respect to his ineffective assistance of trial counsel claim, Page contends that the state court misapprehended the issues he raised, which were not "previously raised issues or new

issues; rather . . .  his trial counsel was procedurally ineffective in regard to her failing

performance to satisfy the procedural aspects of a missing witness claim; a Rosario[1] violation

claim; and the petitioner's insufficient evidence claim."  According to Page, his trial counsel

"failed to investigate Parole Officer Volncia Tamola who was the 23rd person on the people's

witness list, and who had first hand knowledge about the petitioner's arrival time at his parole

interview and his departure from his parole interview during the time the crime was being

committed."  Page contends that, had trial counsel investigated his case appropriately, she would

have learned that Page was on parole at the time of the crime and that he arrived for his parole

interview at 10:00 a.m. and departed "some time at 12:00 o'clock which would have removed

the petitioner from the murder scene and would have affected the trial and verdict."

        According to Page, trial counsel "only had minimum time to prepare herself for what

[was] to be her first Felony Murder trial with barely two months, three weeks and seven days out

of six months to evaluate the relevant fact[s] of the case.'"  Page contends his trial counsel failed

to request additional time to conduct a proper investigation into the prosecution's witness list

and other relevant evidence.  This failure was not harmless, because it prevented the defense

from introducing "critical evidence" at his trial.  According to Page, his trial counsel also failed

"to properly secure a Rosario violation and demonstrate how the loss of Det. Jamal's memo pad

prejudiced and caused harm to [Page]."  He asserts that his trial counsel knew "that a pre-

sentencing investigation report should accompany [Page] who was sentenced to a Correctional

Facility and who had a mental health issue that needed to be treated."  Furthermore, trial counsel

---

[1] Pursuant to <u>People v. Rosario</u>, 9 N.Y.2d 286, 213 N.Y.S.2d 448 (1961), the prosecution is required to surrender to the defense the prior recorded statements of its witnesses that relate to their direct trial testimony.

failed "to preserve the legal sufficiency of the evidence [claim] at trial by moving for a Trial

Order of Dismissal."

Page contends that his appellate counsel "should have been aware of the fact that the

requirements [for obtaining a missing witness jury instruction] which are control, whereabouts,

subpoena, and material was [sic] never satisfied by trial counsel at the trial proceeding."

Furthermore, appellate counsel "ignored and failed to raise ineffective [assistance] of trial

counsel," based on trial counsel's failure "to properly preserve critical material evidence claim

against the weight of the evidence."  Page maintains that, "had trial counsel fulfilled the above

issues procedural requirement(s) the outcome of this case would have been different, and

favorable for the defense."

### Respondent's Contentions

The respondent contends that Page's legal sufficiency claim is procedurally barred,

because the Appellate Division found it unpreserved, based on his failure to raise it at trial.

Since Page failed to raise an objection to the legal sufficiency of the evidence by a motion to

dismiss prior to submitting the case to the jury, as New York law requires, the state procedural

bar is an independent and adequate state ground based on which the state court rejected Page's

claim, and he is not entitled to review of that claim, via a habeas corpus petition.  Alternatively,

the respondent contends that the state court rejected Page's insufficient evidence claim on the

merits.  The respondent maintains that Parsons's testimony was corroborated by substantial

physical evidence, including the hat and glasses Page left at the crime scene, which the DNA

analysis and the unique prescription recorded in Page's medical records showed belonged to

Page.  Furthermore, the gun Page sold immediately following the crime matched conclusively

the bullet retrieved from Ayuso's body.  The respondent contends that the state court found reasonably that Page's challenge to the legal sufficiency of the evidence was without merit.

The respondent maintains that Page's request for a missing witness jury instruction was denied properly, because the prosecutor demonstrated that Joseph had nothing to add to the case, as any testimony he might have given: (i) "was not probative of the main issue contested at trial: petitioner's identity as the shooter"; and (ii) would have been cumulative of Parsons's testimony. Moreover, as no constitutional right to a missing witness jury instruction exists, the trial court's exercise of its discretion not to give such an instruction to the jury was proper, as the Appellate Division found.  In any event, Page's attorney was permitted "to argue the missing witness issue in summation despite the court's refusal to deliver a formal charge."  Thus, the respondent maintains, even assuming that the trial court's refusal to give a missing witness jury instruction was an error, it was harmless, because the record did not provide any basis for the jury to find that Joseph was within the prosecutor's control and possessed material, non-cumulative information.

The respondent contends that Page's claim, that his sentence was unduly harsh because his "psychological problems outlined in a psychologist's pre-sentence report as well as his commitment to rehabilitation, merited more lenient treatment," is "a matter of state law and present[s] no federal constitutional issue."

The respondent maintains that Page's claim of ineffective assistance of trial counsel is procedurally barred because the state court rejected it on an independent and adequate state ground, which is that sufficient facts appeared in the record to decide Page's claim that his trial counsel was not prepared, but he failed unjustifiably to advance that claim on appeal.  Moreover,

relying on CPL § 440.10(2)(a), the state court rejected Page's claim of ineffective assistance of trial counsel, based on her failure to challenge the legal sufficiency of the evidence, because Page's challenge to the evidence was raised and rejected on direct appeal.  According to the respondent, Page failed to show good cause for his procedural default or actual prejudice from trial counsel's purported errors.

The respondent also contends that Page's claims of ineffective assistance of trial counsel are without merit.  He maintains that the record does not suggest "that trial counsel had struggled against the clock to assemble a viable defense"; rather, as the state court explained, counsel "methodically exploited the discrepancies in the witness' testimony" and argued the case vigorously, undermining the prosecution's theory and proposing other possible scenarios of what occurred and who was involved in an effort to raise reasonable doubt in the jury deliberation. The respondent contends that Page failed to "offer a detailed explanation of how his attorney would have benefitted from the extra time he claims was necessary," and he does not "offer any real basis to believe that his attorney did not consider or, in fact, investigate the very leads to which he now refers."  Page's conclusory allegation that, with more time, trial counsel could have investigated other relevant evidence is not enough—especially in light of the deferential standard of review that applies here—to demonstrate that counsel's performance was inadequate or caused him prejudice.  Moreover, Page's trial counsel made a motion for a trial order of dismissal, albeit late, after the jury started deliberating, and his ineffective assistance claim, based on this ground, was rejected, since his sufficiency of the evidence claim was rejected on the merits as an alternative holding.  This shows, the respondent contends, that, even if trial counsel preserved the sufficiency of the evidence claim by making a timely motion, the outcome

17

of his case would not have been different, as his claim was eventually rejected on the merits.

The respondent contends that Page's ineffective assistance of appellate counsel claim is unexhausted, because Page did not make a motion for a writ of error <u>coram</u> <u>nobis</u> in a state court challenging his appellate counsel's performance.  Alternatively, Page's claim is without merit. The respondent contends that the appellate counsel's failure to raise trial counsel's late motion for a trial order of dismissal would have failed, because the state court's finding that the evidence was sufficient would have defeated the claim of ineffective assistance of trial counsel, and "appellate counsel cannot be ineffective for failing to advance that meritless claim."

The respondent contends that Page's remaining grounds for the ineffective assistance of trial counsel claim have been rejected by the Court's ruling on his motion to amend the petition, and are meritless.  They include the claim that trial counsel "was ineffective for failing to investigate parole officer Volncia Tamola as a potential alibi witness," which is procedurally barred, and Page failed to establish that "his trial counsel actually failed to investigate his claimed alibi," or that Volncia Tamola would even appear at trial and about what he would testify.  Page's ineffective assistance of trial counsel claim, based on counsel's failure to secure a missing witness jury instruction, is also procedurally barred and meritless, because the trial court declined to give the missing witness jury instruction based on its finding that the witness was not in the prosecution's control.  Moreover, Page's ineffective assistance of trial counsel claim, based on the failure by counsel to secure a sanction for an alleged <u>Rosario</u> violation, is also procedurally barred and meritless because "his trial counsel successfully argued for and received an appropriate sanction for the claimed disclosure violations."  Similarly, Page's ineffective assistance of trial counsel claim, based on counsel's failure to reschedule his interview with a

mental health professional and to ensure that the doctor's report be included in his presentence report, is unexhausted, as he never raised it in the state court, and it does not articulate a cognizable basis for habeas corpus review.

## DISCUSSION

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim — (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state-court decision is contrary to clearly established Supreme Court precedent if its conclusion on a question of law is "opposite to that reached by [the Supreme] Court," or if the state court reaches a conclusion different from that of the Supreme Court "on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13, 120 S. Ct. 1495, 1523 (2000). A state-court decision involves an unreasonable application of clearly established federal law if "the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," or "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Id. at 407, 120 S. Ct. at 1520. On a petition for a writ of federal habeas corpus, "[t]he petitioner carries the burden of proof." Cullen v. Pinholster, __ U.S. __, 131 S. Ct. 1388, 1398 (2011). "[A] determination of a factual issue made

by a State court shall be presumed to be correct."  28 U.S.C. § 2254(e)(1).  "AEDPA . . . imposes

a highly deferential standard for evaluating state-court rulings, and demands that state-court

decisions be given the benefit of the doubt."  Renico v. Lett, 559 U.S. 766, __, 130 S. Ct. 1855,

1862 (2010) (internal citations and quotation marks omitted).

AEDPA requires a petitioner to exhaust all remedies available in the state courts.  See 28

U.S.C. § 2254(b)(1)(A).  A state court adjudicates a constitutional claim on the merits when it:

(a) disposes of the claim on substantive grounds; and (b) "reduces its disposition to judgment."

Sellan v. Kuhlman, 261 F.3d 303, 312 (2d Cir. 2001).  No articulation of the state court's

reasoning for disposing of the claim is required, as long as a substantive ground is a basis for the

disposition.  See id.  When a claim has not been presented to a state court for adjudication, a

federal court reviewing a habeas corpus petition may deem the claim exhausted "if it is clear that

the unexhausted claim is procedurally barred by state law and, as such, its presentation in the

state forum would be futile."  Aparicio v. Artuz, 269 F.3d 78, 90 (2d Cir. 2001).  A procedurally

defaulted claim may be reviewed by a federal court only if the petitioner shows "cause for the

default and prejudice, or demonstrate[s] that failure to consider the claim will result in a

miscarriage of justice (i.e., the petitioner is actually innocent)."  Id.  To establish cause for a

procedural default, a petitioner must demonstrate that "some objective factor external to the

defense impeded counsel's efforts to comply with the State's procedural rule."  Murray v.

Carrier, 477 U.S. 478, 488, 106 S. Ct. 2639, 2645 (1986).  Federal habeas corpus review is

foreclosed where a state court relied on procedural default as an independent and adequate state

ground even if the state court ruled on the merits of a federal claim in the alternative.  See Harris

v. Reed, 489 U.S. 255, 264 n.10, 109 S. Ct. 1038, 1044 n.10 (1989).  "An application for a writ

20

of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(2).

***Insufficient Evidence***

"[A] federal habeas court may review a claim that the evidence adduced at a state trial was not sufficient to convict a criminal defendant beyond a reasonable doubt."  Herrera v. Collins, 506 U.S. 390, 401, 113 S. Ct. 853, 861 (1993).  In determining whether a conviction is supported by sufficient evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979).

Page's insufficient evidence claim was rejected by the state court as unpreserved, and federal habeas corpus review is foreclosed on that claim because the state court relied on procedural default, as an independent and adequate state ground, when it ruled on that claim.  See People v. Gray, 86 N.Y.2d 10, 18, 629 N.Y.S.2d 173, 174-75 (1995) (holding that preservation of insufficient evidence challenge is necessary).  Page failed to establish cause for his procedural default, because he did not demonstrate that some objective factor external to his defense impeded his counsel's efforts to comply with the state's procedural rule.  See Murray, 477 U.S. at 488, 106 S. Ct. at 2645.

Page's insufficiency of the evidence claim is also meritless.  His contentions, incorporated into the instant petition by reference to his brief on direct appeal, that: (a) "the lack of any blood evidence in Ayuso's apartment, on the stairwell, or in the front hallway of the building . . . indicates that he must have been robbed and shot outside his apartment," which

21

makes the evidence of Page's "hat and glasses, which were found in Ayuso's bathroom . . . less

critical tha[n] it should have appeared to the jury"; (b) "[i]n light of the photograph . . . , it is

simply impossible to believe that Detective Boston missed seeing the hat and glasses, or that

they subsequently tumbled into place"; (c) the credibility of Parsons and Neely "was fatally

compromised," and (d) "independent evidence to back up Parsons's story was utterly lacking,"

go to the jury's determination of witness credibility and the weight of the evidence, not to the

insufficient evidence claim.  Page failed to identify what element of the crimes with which he

was charged was not proved beyond a reasonable doubt; rather, his argument on direct appeal

and here is that the jury verdict "was against the weight of the evidence," and "for the same

reasons, his guilt was not proven beyond a reasonable doubt."  However, Page's weight of the

evidence claim cannot serve to support his insufficient evidence claim.  After viewing the

evidence in the light most favorable to the prosecution, the Court finds that a rational trier of fact

could have found the essential elements of the crimes with which Page was charged, beyond a

reasonable doubt.  Therefore, Page cannot obtain habeas corpus relief based on his claim of

insufficient evidence.

### *Failure to Give Missing Witness Jury Instruction*

To obtain habeas corpus relief on the ground of error in connection with the state court's

jury instruction, the petitioner must demonstrate that the error "so offended established notions

of due process as to deprive the [petitioner] of a constitutionally fair trial."  Cupp v. Naughten,

414 U.S. 141, 144, 94 S. Ct. 396, 399 (1973); see 28 U.S.C. § 2254 (a).  "[I]f a party has it

peculiarly within his power to produce witnesses whose testimony would elucidate the

transaction, the fact that he does not do it creates the presumption that the testimony, if

produced, would be unfavorable."  Graves v. United States, 150 U.S. 118, 121, 14 S. Ct. 40, 41 (1893).  In New York, a court has discretion to give a missing witness charge when the following is established: (1) "the uncalled witness is knowledgeable about a material issue upon which evidence is already in the case"; (2) "the witness would naturally be expected to provide noncumulative testimony favorable to the party who has not called him"; and (3) "the witness is available to such party."  People v. Gonzalez, 68 N.Y.2d 424, 427, 509 N.Y.S.2d 796, 799 (1986).

The Appellate Division rejected Page's missing witness jury instruction claim finding that the "trial court properly denied defendant's request for a missing witness charge regarding the son of the main prosecution witness, on the ground that the uncalled witness was not under People's control."  The state court's finding that Joseph was not under the prosecutor's control is entitled to a high degree of deference.  See Lett, 559 U.S. at __, 130 S. Ct. at 1862.  Since Page failed to establish at trial that Joseph was available to the prosecution, he could not have obtained a missing witness jury instruction.  See Gonzalez, 68 N.Y.2d at 427, 509 N.Y.S.2d at 799.  Consequently, no constitutional violation existed that "offended established notions of due process as to deprive the [petitioner] of a constitutionally fair trial." Naughten, 414 U.S. at 144, 94 S. Ct. at 399.  Accordingly, the Appellate Division's decision, that the trial court did not abuse its discretion when it denied Page's request for a missing witness jury instruction, was not an unreasonable application of clearly established federal law, and Page was not deprived of his constitutional right to a fair trial.  Page is not entitled to habeas corpus relief on his missing witness jury instruction claim.

***Verdict Is Against the Weight of the Evidence***

"[F]ederal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution-not to correct errors of fact." Herrera v. Collins, 506 U.S. 390, 400, 113 S. Ct. 853, 860 (1993). "In the Federal courts . . . it is well settled that upon habeas corpus the court will not weigh the evidence . . . ." Hyde v. Shine, 199 U.S. 62, 84, 25 S. Ct. 760, 764 (1905). Since federal habeas courts do not weigh the evidence, Page's claim that his verdict is against the weight of the evidence is not cognizable in this proceeding, and he cannot obtain relief based on that claim.

***Excessive Sentence***

"No federal constitutional issue is presented where, as here, the sentence is within the range prescribed by state law." White v. Keane, 969 F.2d 1381, 1383 (2d Cir. 1992). As a second-felony offender, Page was sentenced to 25 years imprisonment for the first-degree robbery and an indeterminate term of 25 years to life for the second-degree murder, to run concurrently, and this sentence is within the range prescribed by state law. See New York Penal Law § 60.06, § 70.00, § 70.06 (Jan. 2006). Accordingly, Page cannot obtain habeas corpus relief based on his excessive sentence claim.

***Ineffective Assistance of Counsel***

To obtain relief on an ineffective assistance of counsel claim, a habeas petitioner must establish that his counsel's performance was: (1) deficient, such that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance," Strickland v. Washington, 466 U.S. 668, 690, 104 S. Ct. 2052, 2066 (1984); and (2) prejudicial so that "there is a reasonable probability that, but for counsel's

24

unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S. Ct. at 2068.  In assessing counsel's performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Id. at 689, 104 S. Ct. at 2065.

> Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is . . . difficult.  The standards created by Strickland and § 2254(d) are both "highly differential," and when the two apply in tandem, review is "doubly" so.  The Strickland standard is a general one, so the range of reasonable applications is substantial.  Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d).  When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

> Harrington v. Richter, __ U.S. __, 131 S. Ct. 770, 788 (2011) (internal citations omitted).

Trial Counsel

The state court's determination that Page's "argument that counsel failed to challenge the sufficiency of the evidence was raised and rejected, on the merits, on his direct appeal" is erroneous because Page did not raise an ineffective assistance of counsel claim on direct appeal. Therefore, the state court's reliance on "CPL § 440.10(2)(a)" to deny Page's motion is erroneous.  The Court will review the merits of Page's claim of ineffective assistance of counsel in connection with his claim of insufficient evidence.

Page's ineffective assistance of trial counsel claim made in connection with his insufficient evidence claim is based on his contentions that trial counsel failed to: (i) advise "the court she needed additional time to adequately prepare herself and investigate" the case; (ii) interview witnesses or move timely for an order of dismissal and state "the specific grounds

which were needed to preserve the sufficiency of the evidence" claim; and (iii) include his "pre-sentence probation report in his correctional department file."  Page contends in his petition that, when trial counsel took over his case from her predecessor, "for what was to be her first felony murder case," she had "only . . . two months, three weeks and seven days before trial to evaluate the relevant fact[s] of this case."  However, Page fails to explain why that amount of time was not sufficient to investigate the case and prepare for trial, or how the assertion that Page's case was his trial counsel's "first felony murder case" is relevant to counsel's preparedness.

Page appears to support his contention that his counsel "had a minimum amount of time to prepare herself" by asserting that, in contrast, the prosecutor was "very skilled and experienc[ed] and had over three years to investigate and prepare for this case."  However, whether counsel's performance was deficient is determined in light of all the circumstances and based on whether the identified acts or omissions were outside the wide range of professionally competent assistance, not how counsel's performance compares with the opposing counsel's performance.  See Strickland, 466 U.S. at 689, 104 S. Ct. at 2065 ("[T]he purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation, . . . [but] to ensure that criminal defendants receive a fair trial.").

The Court finds that the record does not indicate that counsel's performance was deficient, such that it fell outside the sphere of professionally competent assistance.  Page failed to rebut the presumption that his trial counsel's performance fell within the wide range of reasonable professional assistance because he did not provide any evidence to substantiate his contentions that his trial counsel did not investigate his case properly or that she needed "additional time to conduct a proper investigation to challenge evidence which would ha[ve]

26

shown substantial weakness in the People's case or theory." Trial counsel's delay in making a motion for a trial order of dismissal, pursuant to CPL § 290.10, is not sufficient on its own and in light of the totality of the circumstances, to demonstrate that Page's trial counsel rendered ineffective assistance to him. Moreover, even assuming that trial counsel's failure to preserve the sufficiency of the evidence claim, based on her untimely motion for a trial order of dismissal, was an error amounting to ineffective assistance of counsel, Page did not satisfy his burden of showing a reasonable probability exists that, but for trial counsel's error, the result of the proceeding would have been different. Thus, habeas corpus relief is not warranted on this claim.

<u>Appellate Counsel</u>

In New York, a writ of error <u>coram nobis</u> is the appropriate remedy for an ineffective assistance of appellate counsel claim. <u>See</u> <u>People v. Bachert</u>, 69 N.Y.2d 593, 594, 516 N.Y.S.2d 623, 624 (1987). Although the Court permitted Page to exhaust his state-court remedies with respect to his claim of ineffective assistance of appellate counsel, he failed to do so, and that claim is unexhausted. Page's ineffective assistance of appellate counsel claim cannot be deemed to be exhausted because no time limit exists in the state court to make a motion for a writ of error <u>coram nobis</u>. <u>See id.</u> at 600, 516 N.Y.S.2d at 628. Accordingly, Page's unexhausted claim of ineffective assistance of appellate counsel cannot be reviewed by a federal habeas corpus court.

**RECOMMENDATION**

For the foregoing reasons, I recommend that Page's petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, be denied.

27

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil

Procedure, the parties shall have fourteen (14) days from service of this Report to file written

objections.  See also Fed. R. Civ. P. 6.  Such objections, and any responses to objections, shall be

filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable

Deborah A. Batts, 500 Pearl Street, Room 2510, New York, New York, 10007, and to the

chambers of the undersigned, 40 Centre Street, Room 425, New York, New York, 10007.  Any

requests for an extension of time for filing objections must be directed to Judge Batts.  *Failure*

*to file objections within fourteen (14) days will result in a waiver of objections and will*

*preclude appellate review.*  See Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985); Cephas v.

Nash, 328 F.3d 98, 107 (2d Cir. 2003).

Dated: New York, New York             Respectfully submitted,
       May 3, 2013

Copy mailed to:

Kenneth Page                          KEVIN NATHANIEL FOX
                                      UNITED STATES MAGISTRATE JUDGE